USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/9/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X

JUAN C. DEL VALLE,                      :

                      Plaintiff,        :      18 Civ. 6622 (HBP)

      -against-                         :      OPINION
                                               AND ORDER
NANCY A. BERRYHILL,                     :
Commissioner of Social Security
                                        :
                      Defendant.        :
-----------------------------------X

            PITMAN, United States Magistrate Judge:


I.   Introduction

            Plaintiff brings this action pursuant to section 205(g)

of the Social Security Act (the "Act"), 42 U.S.C. § 405(g),

seeking judicial review of a final decision of the Commissioner

of Social Security ("Commissioner") denying his application for

disability insurance benefits ("DIB").  All parties have con-

sented to my exercising plenary jurisdiction pursuant to 28

U.S.C. § 636(c).  Plaintiff and the Commissioner have both moved

for judgment on the pleadings pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure (Docket Item ("D.I.") 14, 20).

For the reasons set forth below, the Commissioner's motion is

granted and plaintiff's motion is denied.

II. Facts[1]

A. Procedural Background

On April 1, 2015, plaintiff filed an application for DIB, alleging that he became disabled on August 20, 2014 due to a pinched nerve in his neck, spinal problems, a mass on his testicles and screws in his neck (Tr. 202-03, 294). After his application for benefits was initially denied on July 22, 2015, he requested, and was granted, a hearing before an administrative law judge ("ALJ") (Tr. 208, 253).

On July 18, 2017, plaintiff and his attorney appeared before ALJ John Pope for a hearing at which plaintiff and a vocational expert testified (Tr. 167-201). On August 25, 2017, the ALJ issued his decision finding that plaintiff was not disabled (Tr. 84-92). This decision became the final decision of the Commissioner on June 26, 2018 when the Appeals Council denied plaintiff's request for review (Tr. 1-4). Plaintiff timely commenced this action on August 7, 2018 seeking review of the Commissioner's decision (Complaint, dated Aug. 7, 2018 (D.I. 1) ("Compl.")).

---

[1] I recite only those facts relevant to my resolution of the pending motions. The administrative record that the Commissioner filed pursuant to 42 U.S.C. § 405(g) (see Notice of Filing for Administrative Record, dated July 16, 2018 (D.I. 8) ("Tr.") more fully sets out plaintiff's medical history.

B.  Social Background

Plaintiff was born on November 8, 1975 and was 39 years old at the time he filed his application for DIB (Tr. 294). Plaintiff is divorced and lives with a friend in a house (Tr. 173-74). Plaintiff has a ninth grade education and received a certificate from barber school (Tr. 175).

Plaintiff worked as a dishwasher at various restaurants and facilities from January 1998 through December 2007 (Tr. 314) Plaintiff then worked at a hotel as a dishwasher and banquet setup and cleanup worker from February 2008 through June 2014 (Tr. 176, 314). Plaintiff testified at his hearing that he quit working at the hotel so he could work as a dishwasher at Outback Restaurant, but that he only worked there a week until August 30, 2014 -- the alleged onset date of his disability -- because he was having problems with his hands and back (Tr. 177-78, 314). Plaintiff testified that his former employment as a banquet setup and cleanup worker required him to lift and carry objects between 60 and 100 pounds frequently (Tr. 197). It does not appear from the record that plaintiff ever completed a "Function Report" and his "Disability Report" is mostly blank (Tr. 312-18).

C.  <u>Medical Background</u>

    1.  Medical Records Pre-Dating
       the Relevant Time Period

        a.  Florida Hospital
           Surgery Center

Plaintiff visited Florida Hospital Surgery Center on February 4, 2014 and reported "moderate" pain in his lower back and groin which he attributed to lifting tables at work the night before (Tr. 379).  Plaintiff further reported that the pain increased with movement (Tr. 379).  It is unclear from the record who examined plaintiff, but he was diagnosed with a back sprain and groin strain (Tr. 380).

Plaintiff visited Florida Hospital Surgery Center again on July 3, 2014 and reported pain and weakness in his hands that radiated into his arms and chest pain (Tr. 372-73).  The handwritten examination notes from this visit are largely illegible; however, all of plaintiff's cardiac tests appeared to be normal (Tr. 372-76).

2.  Medical Records for
    the Relevant Time Period

a.  Bronx Lebanon Hospital

Plaintiff underwent an MRI of his cervical spine[2] on
February 23, 2015, which revealed mild to moderate degenerative
changes at C2-C3, C3-C4, C4-C5 and C5-C6 (Tr. 357-59).  No
significant stenosis[3] was noted, but there was significant
narrowing of the neural foramen[4] at C5-C6, causing an impingement
of the exiting left C6 nerve root (Tr. 358).

Plaintiff visited Dr. Michel Bornacelly, a general
practitioner, on April 22, 2015 and reported that he was having
chronic neck pain and was scheduled for an anterior cervical

---

[2]The cervical region of the spine is located closest to the
skull and is made up of vertebrae C1 through C7.  Anatomy of the
Human Spine, Mayfield Brain & Spine, available at
https://www.mayfieldclinic.com/PE-AnatSpine.htm (last visited
August 5, 2019).

[3]Spinal stenosis is the narrowing of spaces within the
spinal cord, which can put pressure on nerves.  See Spinal
Stenosis Overview, Mayo Clinic, available at,
https://www.mayoclinic.org/diseases-conditions/spinal-
stenosis/symptoms-causes/syc-20352961 (last visited August 5,
2019).

[4]Foraminal encroachment or narrowing means that degeneration
of the spinal column has caused an obstruction of the foramina --
open spaces on either side of the vertebrae through which spinal
nerves pass on their way to other parts of the body.  Foraminal
Encroachment, Laser Spine Institute, available at
https://www.laserspineinstitute.com/back_problems/foraminal_steno
sis/encroachment/ (last visited August 5, 2019).

discectomy and fusion ("ACDF") surgery[5] the following day (Tr. 354). Dr. Bornacelly cleared plaintiff for surgery and noted that plaintiff's pain appeared to be well controlled with medication (Tr. 355).

Dr. Joshua Auerbach, an orthopedic surgeon, performed the ACDF surgery on April 23, 2015 and an MRI revealed that the procedure had improved plaintiff's spine alignment at C5-C6 (Tr. 400-01).

Plaintiff had a post-operative visit with Dr. Auerbach on May 7, 2015 and reported that he was experiencing some pain in his neck, but no longer had pain radiating into his arms (Tr. 353). Plaintiff exhibited full muscle strength and normal reflexes and sensations (Tr. 353). Dr. Auerbach opined that plaintiff showed complete neurological improvement since the surgery (Tr. 353).

Plaintiff visited Dr. Bornacelly again on May 20, 2015 and reported improvement in his neck pain and mobility (Tr. 351). Dr. Bornacelly recommended that plaintiff continue with his medication (Tr. 352).

---

[5]ACDF is a surgery to remove a herniated or degenerative disc in the neck. An incision is made in the throat area to reach and remove the disc and a graft is inserted to fuse together the bones above and below the disc. Patients typically are discharged the same day. Anterior Cervical Discectomy & Fusion (ACDF), Mayfield Brain & Spine Institute, available at, https://mayfieldclinic.com/pre_acdf.htm (last visited August 5, 2019).

Plaintiff underwent MRIs of his cervical spine on June 9, 2015 and July 21, 2015, which revealed no abnormalities, unusual swelling or loosening of the hardware inserted during the course of his ACDF fusion surgery (Tr. 403-06).

### b.  Dr. Allen Meisel

Plaintiff visited Dr. Allen Meisel, an internist, for an independent medical evaluation on July 6, 2015 (Tr. 361). Plaintiff reported pain in his right shoulder that he described as a nine out of ten in severity, but that his medication reduced it to a four out of ten (Tr. 361). Plaintiff further reported that he had a small mass on each of his testicles that caused him pain when he sat for more than 20 to 25 minutes at a time (Tr. 361). Plaintiff stated that he was able to dress and bathe himself and cook twice a week, but that he was unable to clean, do laundry, shop or lift objects over ten pounds (Tr. 362).

Plaintiff presented with a normal gait[6] and was able to rise from the examination table without assistance (Tr. 362). Plaintiff exhibited limited range of motion in his cervical spine and right shoulder, but exhibited full range of motion in his lumbar spine, hips, knees and ankles (Tr. 363). He exhibited

---

[6]Gait refers to the manner and style of walking.  Dorland's Illustrated Medical Dictionary, 753 (32nd ed. 2012) ("Dorland's").

full muscle and grip strength and his reflexes and sensations were normal (Tr. 364).

Dr. Meisel diagnosed plaintiff with status post neck surgery, bilateral testicular masses that were scheduled for surgery and elevated cholesterol, and opined that plaintiff had "moderate restrictions" on carrying and lifting because of his recent cervical spinal surgery (Tr. 364).

### c. Montefiore Medical Center[7]

Plaintiff visited Dr. Sayed Emal Wahezi, a physiatrist, at Montefiore Medical Center on June 6, 2016 for removal of his trial cervical spinal cord stimulator[8] (Tr. 410). Plaintiff reported back pain during this visit, but complete improvement in his neck and right shoulder (Tr. 410). Dr. Wahezi diagnosed

---

[7]A large portion of medical records from Montefiore Medical Center pertain to plaintiff's hemorrhoid removal surgery (Tr. 645-78). Because plaintiff does not list hemorrhoids as one of his disabling impairments, I shall not address these records.

[8]A spinal cord stimulator is a small device that is surgically placed under the skin and sends a mild electric current to the spinal cord to mask pain signals before they reach the brain. Spinal Cord Stimulator, Mayfield Brain & Spine Institute, available at, https://mayfieldclinic.com/pre_stim.htm (last visited August 5, 2019). The record does not reflect when plaintiff's trial cervical spinal cord stimulator was implanted.

plaintiff with chronic cervical radiculopathy[9] and referred plaintiff to Dr. William Caldwell, an orthopedist (Tr. 412, 438).

Plaintiff visited Dr. Caldwell, on June 17, 2016 and reported neck and right shoulder pain, but that his trial cervical spinal cord stimulator had eliminated his pain and he was interested in a permanent implant (Tr. 447). Plaintiff exhibited some pain and stiffness in his neck, but exhibited full range of motion and his neurological examination was normal (Tr. 449-50).

Plaintiff visited Dr. Aurada Cholapranee, an internist, on November 29, 2016 to have his testicular masses examined (Tr. 495-96). Plaintiff reported that he was not experiencing pain in his testicles, but reported some urinary incontinence and frequency if he did not take Flomax (Tr. 495-96). Plaintiff did not want a biopsy of the masses (Tr. 496). Plaintiff also reported that his back and neck pain had greatly improved with his spinal cord stimulator (Tr. 496). Aside from the testicular masses, plaintiff's physical examination was normal (Tr. 498).

Plaintiff visited Dr. Laura Douglass, a urologist, on January 4, 2017 for examination of his testicular masses (Tr. 710). Dr. Douglass performed a scrotal sonogram with a doppler to measure the masses and noted that they remained largely unchanged since plaintiff's last visit (Tr. 710). Dr. Douglass

---

[9]Radiculopathy is any disease of the nerve roots commonly caused by inflammation or impingement of the nerve. Dorland's at 1571.

9

diagnosed plaintiff with bilateral testicular nodules that
appeared stable (Tr. 710).

### 3. Supplemental Evidence

After plaintiff's hearing before the ALJ on July 18,
2017, plaintiff's counsel submitted additional medical records to
the Commissioner (Tr. 8-80, 96-164). The medical evidence that
pertains to the relevant period of August 30, 2014, the alleged
onset date of disability, through August 25, 2017, the date of
the ALJ's written decision,[10] is summarized below.

#### a. Montefiore Medical Center

Plaintiff underwent MRIs of his cervical spine on
October 1 and November 16, 2015, which revealed no abnormalities
from his prior discectomy and anterior fusion surgery, but some
moderate cervical spinal canal stenosis at C5-C6 (Tr. 149-53).

Plaintiff visited Dr. Nrupen Baxi, a neurosurgeon, on
September 2, 2016 complaining of chronic right arm pain (Tr.
154). Dr. Baxi discussed the option of permanent implantation of

---

[10]SSA regulations define the relevant period as the date of
the alleged onset of disability through the date of the ALJ's
written decision. See 20 C.F.R. § 404.970(a)(5); Armstrong v.
Berryhill, 16-CV-1404 (DJS), 2018 WL 1357378 at *5 (N.D.N.Y. Mar.
14, 2018); Rodriguez v. Berryhill, 16 Civ. 8752 (AJP), 2017 WL
3701220 at *6 n.3 (S.D.N.Y. Aug. 28, 2017) (Peck, M.J.); Vasquez
v. Comm'r of Soc. Sec., 14 Civ. 6900 (JCF), 2015 WL 4562978 at *3
n.15 (S.D.N.Y. July 21, 2015) (Francis, M.J.).

a cervical spinal cord stimulator to address the pain because plaintiff reported complete pain relief with his previous trial stimulator (Tr. 154). Plaintiff followed up with Dr. Baxi on September 23, 2016 and reported that his neck pain was a ten out of ten (Tr. 155). Plaintiff exhibited full muscle strength and normal sensations in his arms and legs during this examination, but exhibited slightly diminished reflexes and limited range of motion in his neck (Tr. 157). Dr. Baxi diagnosed plaintiff with neck pain and recommended that plaintiff be cleared by a urologist with respect to his testicular masses before surgery to implant a permanent cervical spinal cord stimulator (Tr. 157-58).

Dr. Baxi implanted this stimulator on October 13, 2016 after it was determined that a testicular biopsy was not necessary (Tr. 159-64).

Plaintiff visited Dr. Kara L. Watts, a urologist, on April 17, 2017 for a follow-up examination of his testicular masses (Tr. 97-115). After examining the masses with a doppler, Dr. Watts noted that there were no significant changes in the masses since plaintiff's last examination (Tr. 97-115).

Plaintiff visited Dr. Watts again on May 17, 2017 (Tr. 116-25). Dr. Watts opined that given the minimal growth of plaintiff's masses over the last three years, that the likelihood that plaintiff had an aggressive form of testicular cancer was

minimal and recommended that he return for a follow-up sonogram in six months (Tr. 118).

Plaintiff visited Dr. Watts again on August 21, 2017 (Tr. 126). Based on his sonography, Dr. Watts opined that there was minimal change in plaintiff's testicular lesions and recommended another sonography in six months (Tr. 131).

D. Proceedings Before the ALJ

1. Plaintiff's Testimony

Plaintiff testified that he was still experiencing pain in his neck, shoulders, arms and back at the time of the hearing (Tr. 192-94). Plaintiff reported that he was not currently taking any pain medication, but that he was still using his spinal cord stimulator (Tr. 188, 195). He claimed that because of his ongoing pain, he was unable to walk more than a block, to stand more than an hour or to lift objects weighing more than ten pounds (Tr. 181-82). Plaintiff further testified that his daily activities included making breakfast, dressing and bathing himself, going shopping, watching television and playing video games (Tr. 189-92).

With respect to plaintiff's testicular masses, plaintiff testified that the masses were too small for the doctors to biopsy, but that they were continuing to monitor them every six months (Tr. 181).

2. Vocational Expert's Testimony

Vocational expert Celena Earl ("the VE") also testified
at the hearing.  The VE testified that plaintiff's past work,
described in the United States Department of Labor's Dictionary
of Occupational Titles ("DOT") as a cleanup worker, DOT Code
381.687-014, was considered heavy, unskilled work, and that his
past work as a kitchen helper, DOT Code 318.687-014, was
considered medium, unskilled work (Tr. 199).  The ALJ did not
pose any hypotheticals to the VE.

III.  Analysis

A.  Applicable
Legal Principles

1.  Standard of Review

The Court may set aside the final decision of the
Commissioner only if it is not supported by substantial evidence
or if it is based upon an erroneous legal standard.  42 U.S.C. §
405(g); Lockwood v. Comm'r of Soc. Sec. Admin., 914 F.3d 87, 91
(2d Cir. 2019); Selian v. Astrue, 708 F.3d 409, 417 (2d Cir.
2014) (per curiam); Talavera v. Astrue, 697 F.3d 145, 151 (2d
Cir. 2012); Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008).
Moreover, the court cannot "affirm an administrative action on
grounds different from those considered by the agency."

13

Lesterhuis v. Colvin, 805 F.3d 83, 86 (2d Cir. 2015), quoting
Burgess v. Astrue, supra, 537 F.3d at 128.

The Court first reviews the Commissioner's decision for
compliance with the correct legal standards; only then does it
determine whether the Commissioner's conclusions were supported
by substantial evidence. Byam v. Barnhart, 336 F.3d 172, 179 (2d
Cir. 2003), citing Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir.
1999). "Even if the Commissioner's decision is supported by
substantial evidence, legal error alone can be enough to overturn
the ALJ's decision." Ellington v. Astrue, 641 F. Supp. 2d 322,
328 (S.D.N.Y. 2009) (Marrero, D.J.). However, "where application
of the correct legal principles to the record could lead to only
one conclusion, there is no need to require agency reconsidera-
tion." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

"'Substantial evidence' is 'more than a mere scintilla.
It means such evidence as a reasonable mind might accept as
adequate to support a conclusion.'" Talavera v. Astrue, supra,
697 F.3d at 151, quoting Richardson v. Perales, 402 U.S. 389, 401
(1971). Consequently, "[e]ven where the administrative record
may also adequately support contrary findings on particular
issues, the ALJ's factual findings 'must be given conclusive
effect' so long as they are supported by substantial evidence."
Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam),
quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982).

14

Thus, "[i]n determining whether the agency's findings were supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" Selian v. Astrue, supra, 708 F.3d at 417 (citation omitted).

    2.  Determination
        Of Disability

A claimant is entitled to DIB if he can establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months."[11]  42 U.S.C. § 423(d)(1)(A); see Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both impairment and inability to work must last twelve months).  The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 423(d)(3), and it must be

> of such severity that [the claimant] is not only unable
> to do his previous work but cannot, considering [the
> claimant's] age, education, and work experience, engage

---

[11]The standards that must be met to receive SSI benefits under Title XVI of the Act are the same as the standards that must be met in order to receive DIB under Title II of the Act. Barnhart v. Thomas, 540 U.S. 20, 24 (2003).  Accordingly, cases addressing the former are equally applicable to cases involving the latter.

in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [the claimant] lives, or whether a specific job vacancy exists for [the claimant], or whether [the claimant] would be hired if [the claimant] applied for work.

42 U.S.C. § 423(d)(2)(A). In addition, to obtain DIB, the claimant must have become disabled between the alleged onset date and the date on which he was last insured. See 42 U.S.C. §§ 416(i), 423(a); 20 C.F.R. §§ 404.130, 404.315; McKinstry v. Astrue, 511 F. App'x 110, 111 (2d Cir. 2013) (summary order), citing Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008). In making the disability determination, the Commissioner must consider: "'(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience.'" Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam), quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).

In determining whether an individual is disabled, the Commissioner must follow the five-step process required by the regulations. 20 C.F.R. § 404.1520(a)(4)(i)-(v); see Selian v. Astrue, supra, 708 F.3d at 417-18; Talavera v. Astrue, supra, 697 F.3d at 151. The first step is a determination of whether the claimant is engaged in substantial gainful activity ("SGA"). 20 C.F.R. § 404.1520(a)(4)(i). If he is not, the second step

requires determining whether the claimant has a "severe medically determinable physical or mental impairment." 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled. See Henningsen v. Comm'r of Soc. Sec. Admin., 111 F. Supp. 3d 250, 264 (E.D.N.Y. 2015); 20 C.F.R. § 404.1520(c). If he does, the inquiry at the third step is whether any of claimant's impairments meet one of the listings in Appendix 1 of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If the answer to this inquiry is affirmative, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not meet any of the listings in Appendix 1, step four requires an assessment of the claimant's residual functional capacity ("RFC") and whether the claimant can still perform his past relevant work given his RFC. 20 C.F.R. § 404.1520(a)(4)(iv); see Barnhart v. Thomas, supra, 540 U.S. at 24-25. If he cannot, then the fifth step requires assessment of whether, given the claimant's RFC, he can make an adjustment to other work. 20 C.F.R. § 404.1520(a)(4)(v). If he cannot, he will be found disabled. 20 C.F.R. § 404.1520(a)(4)(v).

RFC is defined in the applicable regulations as "the most [the claimant] can still do despite his limitations." 20 C.F.R. § 404.1545(a)(1). To determine RFC, the ALJ "'identif[ies] the individual's functional limitations or re-

strictions and assess[es] . . . his work-related abilities on a function-by-function basis, including the functions in paragraphs (b),(c), and (d) of 20 [C.F.R. §] 404.1545 . . . .'" Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam), quoting Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *1 (July 2, 1996). The results of this assessment determine the claimant's ability to perform the exertional demands of sustained work which may be categorized as sedentary, light, medium, heavy or very heavy.[12] 20 C.F.R. § 404.1567; see Schaal v. Apfel, 134 F.3d 496, 501 n.6 (2d Cir. 1998). This ability may then be found to be limited further by nonexertional factors that restrict the claimant's ability to work.[13] See Michaels v. Colvin, 621 F. App'x 35, 38 n.4 (2d Cir. 2015) (summary order); Zabala v. Astrue, 595 F.3d 402, 410-11 (2d Cir. 2010).

The claimant bears the initial burden of proving disability with respect to the first four steps. Once the claimant has satisfied this burden, the burden shifts to the

---

[12]Exertional limitations are those which "affect only [the claimant's] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)." 20 C.F.R. § 404.1569a(b).

[13]Nonexertional limitations are those which "affect only [the claimant's] ability to meet the demands of jobs other than the strength demands," including difficulty functioning because of nervousness, anxiety or depression, maintaining attention or concentration, understanding or remembering detailed instructions, seeing or hearing, tolerating dust or fumes, or manipulative or postural functions, such as reaching, handling, stooping, climbing, crawling or crouching. 20 C.F.R. § 404.1569a(c).

Commissioner to prove the final step -- that the claimant's RFC allows the claimant to perform some work other than his past work. Selian v. Astrue, supra, 708 F.3d at 418; Burgess v. Astrue, supra, 537 F.3d at 128; Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended in part on other grounds on reh'g, 416 F.3d 101 (2d Cir. 2005).

In some cases, the Commissioner can rely exclusively on the Medical-Vocational Guidelines (the "Grids") contained in C.F.R. Part 404, Subpart P, Appendix 2 when making the determination at the fifth step. Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995). "The Grid[s] take[] into account the claimant's RFC in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid[s] indicate[] whether the claimant can engage in any other substantial gainful work which exists in the national economy." Gray v. Chater, supra, 903 F. Supp. at 298; see Butts v. Barnhart, supra, 388 F.3d at 383.

Exclusive reliance on the Grids is not appropriate where nonexertional limitations "significantly diminish [a claimant's] ability to work." Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986); accord Butts v. Barnhart, supra, 388 F.3d at 383. "Significantly diminish" means "the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of

a meaningful employment opportunity." Bapp v. Bowen, supra, 802 F.2d at 606 (footnote omitted); accord Selian v. Astrue, supra, 708 F.3d at 421; Zabala v. Astrue, supra, 595 F.3d at 411. Before an ALJ determines that sole reliance on the Grids is proper in determining whether a plaintiff is disabled under the Act, he must ask and answer the intermediate question -- whether the claimant has nonexertional limitations that significantly diminish her ability to work; an ALJ's failure to explain how he reached his conclusion to this question is "plain error". See Maldonado v. Colvin, 15 Civ. 4016 (HBP), 2017 WL 775829 at *21-*23 (S.D.N.Y. Feb. 23, 2017) (Pitman, M.J.); see also Bapp v. Bowen, supra, 802 F.2d at 606 ; St. Louis ex rel. D.H. v. Comm'r of Soc. Sec., 28 F. Supp. 3d 142, 148 (N.D.N.Y. 2014); Baron v. Astrue, 11 Civ. 4262 (JGK)(MHD), 2013 WL 1245455 at *19 (S.D.N.Y. Mar. 4, 2013) (Dolinger, M.J.) (Report & Recommendation), adopted at, 2013 WL 1364138 (S.D.N.Y. Mar. 26, 2013) (Koeltl, D.J.). When the ALJ finds that the nonexertional limitations do significantly diminish a claimant's ability to work, then the Commissioner must introduce the testimony of a vocational expert or other similar evidence in order to prove "that jobs exist in the economy which [the] claimant can obtain and perform." Butts v. Barnhart, supra, 388 F.3d at 383-84 (internal quotation marks omitted); see Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an individual's capabilities are not described accurately by

a rule, the regulations make clear that the individual's particu-
lar limitations must be considered.").

B.   The ALJ's Decision

The ALJ applied the five-step analysis described above
and determined that plaintiff was not disabled (Tr. 84-92).

As an initial matter, the ALJ found that plaintiff met
the insured status requirements of the Act through December 31,
2019 (Tr. 86).

At step one, the ALJ found that plaintiff had not
engaged in SGA since August 30, 2014 (Tr. 86).

At step two, the ALJ concluded that plaintiff suffered
from the severe impairment of cervical stenosis with myelopathy[14]
(Tr. 86).   The ALJ also concluded that plaintiff suffered from
the non-severe impairments of testicular masses and high
cholesterol (Tr. 86-87).

At step three, the ALJ found that plaintiff's impair-
ments did not meet or medically equal the criteria of the listed
impairments and that plaintiff was not, therefore, entitled to a
presumption of disability (Tr. 87).   In reaching his conclusion,
the ALJ stated that he gave specific consideration to Listing
1.04 and found that the medical record did "not include evidence

---

[14]Myelopathy refers to functional disturbances or
pathological changes in the spinal cord.   Dorland's at 1221.

of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis", or "an inability to ambulate effectively" (Tr. 87).

The ALJ then determined that plaintiff retained the RFC to perform a full range of medium work[15] with no limitations (Tr. 87). In reaching his RFC determination, the ALJ found that plaintiff did not have any treating physicians with respect to his cervical spine impairment. However, the ALJ afforded only "some weight" to consultative physician Dr. Meisel's July 6, 2015 opinion that plaintiff had "a moderate restriction of carrying and lifting due to the effects of his fusion surgery" because it was given "only three months removed" from plaintiff cervical spinal fusion surgery and, thus, was not completely "indicative of [plaintiff's] condition as a whole" (Tr. 91). The ALJ also considered the MRIs of plaintiff's cervical spine, plaintiff's cervical spinal fusion surgery, the treatment notes of other physicians and plaintiff's testimony in determining plaintiff's RFC (Tr. 88-91). The ALJ found that while plaintiff's medically determinable impairments could reasonably have caused his alleged symptoms, his statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consis-

_____

[15]The regulations define "medium work" as work which "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

tent with the medical evidence and other evidence in the record (Tr. 88-90).

At step four, the ALJ concluded that plaintiff could perform his past relevant work as a kitchen helper because the VE had defined that job as a medium exertion position as it is performed in the national economy (Tr. 92).

C. Analysis of
the ALJ's Decision

Plaintiff contends that the ALJ's disability determination was erroneous because (1) the ALJ erred when he found that plaintiff's impairment did not meet or medically equal Listing 1.04; (2) the ALJ's finding that plaintiff had the RFC to do medium work was not supported by substantial evidence; (3) the ALJ failed to develop the record because he failed to obtain a medical opinion from plaintiff's treating physician, Dr. Caldwell; (4) the ALJ incorrectly relied on the VE's testimony and (5) plaintiff's new evidence that was submitted to the Appeals Council supported a finding of disability and the Appeals Council erred in not considering it (Memorandum of Law in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings, dated Apr. 22, 2019 (D.I. 21) ("Pl. Memo.")). The Commissioner contends that the ALJ's decision was supported by substantial evidence and should be affirmed (Memorandum of Law in Support of

Defendant's Motion for Judgment on the Pleadings, dated Jan. 22, 2019 (D.I. 15) ("Def. Memo.")).

As described above, the ALJ went through the sequential process required by the regulations. The ALJ's analysis at steps one and two were decided in plaintiff's favor, and the Commissioner has not challenged those findings. I shall, therefore, limit my discussion to addressing whether the ALJ's analysis at steps three and four complied with the applicable legal standards and was supported by substantial evidence.

1.  Step 3: The Listings

At step three, the ALJ found that plaintiff's cervical stenosis impairment was not severe enough to meet or medically equal the impairments listed in Section 1.04 (Tr. 87, citing 20 C.F.R. Pt. 404, Subpt. P, App. 1). To show that an impairment meets or is medically equal to a listing, a claimant must show that his impairments "meet all of the specified criteria." Sullivan v. Zebley, supra, 493 U.S. at 530; accord Solis v. Berryhill, 692 F. App'x 46, 48 (2d Cir. 2017); King v. Astrue, 32 F. Supp. 3d 210, 218 (N.D.N.Y. 2012). If a claimant's impairment "manifests only some of those criteria, no matter how severely," the impairment does not qualify. Sullivan v. Zebley, supra, 493 U.S. at 530; see also Scully v. Berryhill, 282 F. Supp. 3d 628, 636 (S.D.N.Y. 2017) (Gorenstein, M.J.). To satisfy this burden,

a claimant must show abnormal physical findings that "must be determined on the basis of objective observation during the examination and not simply a report of the individual's allegation." 20 C.F.R. pt. 404, Subpt. P, App. 1, § 1.00(D).

Section 1.04 addresses disorders of the spine and requires a showing of a "compromise of a nerve root . . . or the spinal cord" with one or more of the following:

> (A)  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

> (B)  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

> (C)  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively.

20 C.F.R. pt. 404, Subpt. P, App. 1, § 1.04.

The ALJ found that the medical record did "not include evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis", or "an inability to ambulate effectively" (Tr. 87).  Plaintiff maintains that remand is required because the ALJ incorrectly stated that there was no evidence of

nerve root compression in the record and that there was evidence that plaintiff had an "inability to perform fine and gross movements effectively" (Pl. Memo. at 16-17). While plaintiff does not specify which subsection of Listing 1.04 he purports to meet, it is obvious that the only subsection applicable here is 1.04(A) considering there is no mention or allegation of spinal arachnoiditis or lumbar spinal stenosis anywhere in the medical record.

As plaintiff correctly points out, his February 23, 2015 cervical spine MRI revealed that there was an impingement of the exiting C6 nerve root that required him to have cervical fusion surgery (Tr. 358). Thus, it appears that the ALJ erred in stating that the medical record did "not include evidence of nerve root compression" (Tr. 87). However, any such error was harmless because a review of the overall treatment period supports the finding that not all the criteria listed in Listing 1.04(A) were met and the ALJ's ruling is, therefore, supported by substantial evidence. See King v. Astrue, supra, 32 F. Supp. 3d at 219 (remand not required where ALJ "erred in failing to explicitly reconcile [a] conflict in the record" concerning Section 1.04(A) because even with this error, there was substantial evidence to show plaintiff did not meet all of the required criteria).

Any evidence of nerve compression was not accompanied by all the aggravating factors required by Listing 1.04(A) -- namely, motor loss accompanied by sensory or reflex loss. There does not appear to be a single medical examination throughout the relevant period that documents any of these aggravating factors with the exception of one examination on September 23, 2016 where plaintiff exhibited slightly diminished reflexes (Tr. 157). After plaintiff's surgery, he exhibited full muscle strength and normal reflexes and sensations at examinations on May 7, 2015, July 6, 2015 and June 17, 2016 (Tr. 353, 364, 449-50). While plaintiff argues that he suffers from an inability to perform fine and gross movements effectively, he does not cite to any medical evidence supporting this and relies entirely on his own subjective complaints of pain (Pl. Memo. at 16-17). See 20 C.F.R. pt. 404, Subpt. P, App. 1, § 1.00(D) (claimant's burden of showing he met a listing cannot be satisfied by "simply a report of the individual's allegation"). In fact, the record shows that plaintiff reported improvement with his neck pain and mobility at his post-operative examination on May 20, 2015 (Tr. 351).

Thus, plaintiff is not entitled to remand because substantial evidence supports the conclusion that plaintiff did not meet all the criteria required to meet or medically equal Listing 1.04(A). King v. Astrue, supra, 32 F. Supp. 3d at 219.

2.  Step 3: the ALJ's
    RFC Determination

The ALJ found that plaintiff had the RFC to perform
medium work with no limitations.  Again, the ALJ's RFC finding is
supported by substantial evidence.

As the ALJ correctly pointed out, plaintiff's treatment
for his cervical spine impairment was sporadic, and the treatment
he received appeared to be successful.  Dr. Auerbach performed
ACDF surgery on plaintiff on April 23, 2015 (Tr. 400-01).  Dr.
Auerbach opined that plaintiff showed complete neurological
improvement from this procedure and plaintiff reported improve-
ment in his neck pain and mobility at a follow-up appointment on
May 20, 2015 (Tr. 352-53).  Plaintiff also underwent MRIs of his
cervical spine on June 9 and July 15, 2015, which revealed no
abnormalities (Tr. 403-06).

Plaintiff did not consult any physician concerning his
cervical impairment until almost a year later when he visited Dr.
Wahezi on June 6, 2016 for the removal of his spinal cord
stimulator trial (Tr. 410).  This treatment also appeared to be
successful as plaintiff reported complete improvement in his neck
and right shoulder pain with use of the stimulator (Tr. 410).
Dr. Caldwell noted that plaintiff exhibited full range of motion
in his neck on June 17, 2016 and that his neurological examina-
tion was normal (Tr. 449-50).  Plaintiff did not seek treatment

again until September 2016 when he reported right arm and neck pain to Dr. Baxi (Tr. 154-58). Dr. Baxi implanted a permanent spinal cord stimulator a month later, which again improved plaintiff's condition significantly (Tr. 159-64). Plaintiff testified at the hearing that he is no longer taking pain medication because he uses his stimulator for pain management (Tr. 195).

Furthermore, there is no objective medical evidence or opinion evidence in the record pertaining to the relevant period that corroborates plaintiff's assertion that he is unable to perform medium work. The only physician who assessed plaintiff's functional limitations was consultative physician, Dr. Meisel, who opined that plaintiff had some "moderate" lifting and carrying restrictions due to his recent cervical fusion surgery (Tr. 364). However, Dr. Meisel also found that plaintiff had full range of motion in his lumbar spine, hips, knees and ankles and exhibited full muscle and grip strength and normal reflexes and sensations (Tr. 363-64). This examination is not inconsistent with an RFC finding of medium exertion.

Thus, the ALJ's RFC finding is supported by substantial evidence.

a.  Duty to Develop the Record

Plaintiff maintains that the ALJ's RFC finding was erroneous because he incorrectly stated that plaintiff had no treating physicians and should have obtained a medical source statement from Dr. Caldwell (Pl. Memo. at 10-11).

"The ALJ's duty to develop the record includes seeking opinion evidence, usually in the form of medical source statements, from the claimant's treating physicians." Martinez v. Comm'r of Soc. Sec., 16 Civ. 2298 (PGG)(BCM), 2017 WL 9802837 at *13 (S.D.N.Y. Sept. 19, 2017) (Moses, M.J.) (Report & Recommendation), adopted at, 2018 WL 1474405 (S.D.N.Y. Mar. 26, 2018) (Gardephe, D.J.), citing 20 C.F.R. §§ 404.1513(b)(6) (2013), 416.913(b)(6) (2013).

However, contrary to plaintiff's allegations, the ALJ correctly found that Dr. Caldwell was not a treating physician. According to the record, plaintiff visited Dr. Caldwell once on June 17, 2016 for neck and shoulder pain (Tr. 447-50).[16]  Although there is "no minimum number of visits required to establish a treating physician relationship", "[a] physician who has examined a claimant on one or two occasions is generally not considered a treating physician." Nunez v. Berryhill, 16 Civ.

_____

[16]Plaintiff maintains that Dr. Caldwell implanted plaintiff's trial spinal cord stimulator, however, no treatment notes or records exist from that visit.

30

5078 (HBP), 2017 WL 3495213 at *23 (S.D.N.Y. Aug. 11, 2017)
(Pitman, M.J.), citing 20 C.F.R. § 404.1527(a)(2) (A treating
physician is one who the claimant has seen "with a frequency
consistent with medical practice for the type of treatment . . .
required for [claimant's] medical condition" to establish an
"ongoing treatment relationship" with the claimant.).

In any event, remand would still be unwarranted even if
Dr. Caldwell could be considered a treating physician because the
record here "contains sufficient evidence from which an ALJ can
assess the [plaintiff's] residual functional capacity." Tankisi
v. Comm'r of Soc. Sec., 521 F. App'x 29, 34 (2d Cir. 2013)
(summary order). While the medical record pertaining to plain-
tiff's cervical impairment for the relevant period of August 30,
2014 through August 25, 2017 is relatively short, the ALJ's
decision shows that he considered all treatment notes from
plaintiff's physicians, including a medical source statement from
Dr. Meisel whose overall examination of plaintiff was consistent
with the ALJ's RFC finding. Pellam v. Astrue, 508 F. App'x 87,
90 n.2 (2d Cir. 2013) (summary order) ("[b]ecause [the consulta-
tive examiner's] opinion was largely consistent with the ALJ's
conclusions, we need not decide whether a record would be ren-
dered incomplete by the failure to request a medical source
opinion from a treating physician"). Moreover, the SSA regula-
tions state that "the lack of a [medical source] statement [does]

not, by itself, necessarily render the record incomplete."

Pellam v. Astrue, supra, 508 F. App'x at 90 n.2.

Thus, remand is not required merely to obtain a medical source statement from Dr. Caldwell.

### 3. Step 4: the VE's Testimony

Plaintiff next argues that the ALJ improperly found that plaintiff was capable of performing his past work as a kitchen helper because he erred in relying on the VE's evaluation of plaintiff's past work (Pl. Memo. at 13-14). Plaintiff maintains that the VE's testimony was flawed because she only testified as to plaintiff's past work and not to his current abilities (Pl. Memo. at 13). Plaintiff's argument is meritless because the VE properly described plaintiff's past work as a kitchen helper as medium exertion, unskilled work. Considering the ALJ found that plaintiff had an RFC of medium work with no additional limitations, there were no additional hypotheticals that would have been appropriate to ask the VE. Moreover, the VE is not qualified to testify as to plaintiff's physical abilities; rather, her expertise lies in what jobs exist in the national economy and what level of exertion is required to perform those jobs.

Thus, the VE's testimony with respect to plaintiff's past work was not flawed and the ALJ properly relied on it when

he determined that plaintiff was capable of performing his past work as a kitchen helper as it is performed in the national economy.[17]

### 4. Plaintiff's New Evidence

#### a. Evidence Submitted to the Appeals Council

Plaintiff submitted additional medical records after the ALJ's decision on August 25, 2017, but prior to the Appeals Council's denial on June 26, 2018 (Tr. 8-166). These records document treatment from October 1, 2015 through June 8, 2018 (Tr. 8-166). The Appeals Council found that there was not a "reasonable probability" that the records documenting treatment prior to the ALJ's August 25, 2017 decision "would [have] changed the outcome of [the ALJ's] decision" and that the records documenting treatment post-August 25, 2017 did not relate to the period at issue because such evidence related to the period after the ALJ's decision (Tr. 2). The Appeals Council also advised plaintiff of his right to file a new claim for disability for the

---

[17]Plaintiff also argues that because the VE did not testify as to plaintiff's current abilities, the ALJ improperly substituted his own arbitrary opinion in place of medical evidence to determine plaintiff's RFC. Plaintiff's argument is simply a rehashing of his previous challenges to the ALJ's RFC analysis. As already discussed at length above, the ALJ's RFC finding was not deficient and was supported by substantial evidence.

time period after August 25, 2017 (Tr. 2). Plaintiff argues that the Appeals Council erred in not considering this new evidence (Pl. Memo. at 19-21).[18]

"SSA regulations specify that if new and material evidence is submitted after the [ALJ's] decision, the Appeals Council shall consider it only where it relates to the period on or before the date of the hearing decision." Vasquez v. Comm'r of Soc. Sec., supra, 2015 WL 4562978 at *3 n.15, citing 20 C.F.R. §§ 404.970(a)(5); accord Armstrong v. Berryhill, supra, 2018 WL 1357378 at *5; Rodriguez v. Berryhill, supra, 2017 WL 3701220 at *6 n.3.

Thus, with respect to the medical records that relate to plaintiff's treatment after August 25, 2017, the Appeals Council correctly found that this evidence was not relevant to the time period for which benefits were denied because it post-dates the ALJ's decision. Plaintiff's allegations that such evidence "demonstrates that the severity of [p]laintiff's conditions increased after the date of the [ALJ's] determination" is of no matter because such allegations would be "better placed in a new application for [DIB] benefits." Armstrong v. Berryhill, supra, 2018 WL 1357378 at *5 (proper for the Appeals Council to disregard evidence that was documented after the ALJ's written

---

[18]Plaintiff does not appear to challenge the Appeals Council's determination that the records pre-dating the ALJ's decision would not have changed the ALJ's determination.

decision even though it showed a possible deterioration of
plaintiff's impairments); <u>Pearson v. Astrue</u>, 10-CV-0521 (MAD),
2012 WL 527675 at *11-12 (N.D.N.Y. Feb. 17, 2012) (rejecting
plaintiff's contentions that the Appeals Council should have
considered evidence that showed that the severity of plaintiff's
impairment had increased significantly post-hearing because
"[e]vidence of a deteriorating condition is not material to the
ALJ's decision if it is documented after the ALJ rendered the
decision.").

       b.  Evidence Submitted
          <u>to the Court</u>

Plaintiff also submitted additional medical records
with respect to the present motion that document treatment from
November 14, 2017 through February 2, 2019 (Declaration of Jack
Yoskowitz, Esq., dated Apr. 22, 2019 (D.I. 22) ("Yoskiwitz
Decl.")).  Plaintiff maintains that this additional evidence is
"new" and "material" and, thus, warrants remand for the Commis-
sioner to consider it (Pl. Memo. at 22-25).

The Act permits a reviewing court to remand a case to
the Commissioner "upon a showing that there is new evidence," but
only if that new evidence is "material" and there is "good cause
for the failure to incorporate such evidence into the record in a
prior proceeding."  42 U.S.C. § 405(g); <u>accord</u> <u>Perez v. Chater</u>,
77 F.3d 41, 45 (2d Cir. 1996); <u>Tirado v. Bowen</u>, 842 F.2d 595, 597

(2d Cir. 1988); see also Diaz v. Colvin, 14 Civ. 2277 (KPF), 2015 WL 4402941 at *17 (S.D.N.Y. July 19, 2015) (Failla, D.J.) ("The Act sets a stringent standard for remanding based on new evidence alone."). New evidence is considered "material" if "it is (a) relevant to [plaintiff's] condition during the time period for which benefits were denied; (b) probative; and (c) reasonably likely to have influenced the Commissioner to decide [plaintiff's] application differently." Henderson v. Berryhill, 342 F. Supp. 3d 396, 403 (W.D.N.Y. 2018), citing Mulrain v. Comm'r of Soc. Sec., 431 F. App'x 38, 39 (2d Cir. 2011) (summary order).

While the new evidence submitted by plaintiff appears to be related to his cervical impairment, all of the records relate to plaintiff's condition between three months and more than two years after the ALJ's decision. The treatment records do "not provide a probative or retrospective opinion of plaintiff's health before the ALJ rendered his decision" and "do not suggest that [his] symptoms were worse during the period under consideration than the ALJ contemplated." Henderson v. Berryhill, supra, 342 F. Supp. 3d at 403. Rather, "the new evidence suggests at most that [plaintiff's] condition worsened after the ALJ's decision, which is not a basis to remand." Henderson v. Berryhill, supra, 342 F. Supp. 3d at 403 (quotation marks and citation omitted); accord Armstrong v. Berryhill,

_supra_, 2018 WL 1357378 at *5; _Pearson v. Astrue_, _supra_, 2012 WL 527675 at *11-*12.

Thus, because plaintiff's new evidence does not relate back to the relevant period, it is not material to my review and remand is unwarranted. As discussed above, the more appropriate action here would be for plaintiff to file a new disability claim for the time period after the ALJ's determination.

IV. Conclusion

Accordingly, for all the foregoing reasons, the Commissioner's motion for judgment on the pleadings is granted and plaintiff's motion is denied. The Clerk of the Court is respectfully requested to mark D.I. 14 and D.I. 20 closed, and respectfully requested to close the case.

Dated: New York, New York
September 9, 2019

SO ORDERED

_____
HENRY PITMAN
United States Magistrate Judge

Copies transmitted to

All Counsel